# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-12-00281-CR

**Naum Antonio Fuentes-Sanchez, Appellant**

**v.**

**The State of Texas, Appellee**

## FROM THE DISTRICT COURT OF BURNET COUNTY, 33RD JUDICIAL DISTRICT
## NO. 39310, THE HONORABLE GUILFORD L. JONES, III, JUDGE PRESIDING

## M E M O R A N D U M   O P I N I O N

A jury convicted appellant, Naum Antonio Fuentes-Sanchez, of eight offenses—two counts of aggravated sexual assault, burglary of a habitation, two counts of aggravated robbery, injury to the elderly, and two counts of aggravated assault—all arising out of a single home invasion. *See* Tex. Penal Code §§ 22.02, 22.021, 22.04, 29.03, 30.02. The jury assessed his punishment at confinement in the Texas Department of Criminal Justice for each offense, with the sentences ranging from 20 years to life. *See id.* §§ 12.32, 12.33, 22.02(b), 22.021(e), 22.04(e), 29.03(b), 30.02(d). On appeal, appellant complains about the denial of his motion to suppress, unlawful police conduct, and error in the jury charge. Finding no reversible error, we affirm the judgments of conviction for burglary of a habitation, aggravated robbery (both counts), and injury to the elderly. However, through our own review of the record, we have found errors in the written judgments of

conviction for the aggravated-sexual-assault offenses and the aggravated-assault offenses. We modify those judgments to correct the errors and affirm those judgments of conviction as modified.

## BACKGROUND[1]

Shortly after BD and CD, husband and wife, retired to bed the night of April 13, 2009, appellant and two others broke into their ranch home.[2] Hearing the family dog barking at the intrusion, CD awoke and woke up her husband. With gun in hand, BD went to investigate. He entered the study and confronted two armed intruders. However, a third intruder ambushed him from behind. He was then subdued and savagely beaten by the intruders. CD came to her husband's aid, hitting one of the intruders on the head with a flashlight and biting him on the hand during the ensuing struggle, but she too was subdued and beaten. CD was also brutally raped, both vaginally and anally, by two of the intruders. At some point during the attack, the assailants placed pillowcases over the victims' heads and bound their hands and feet with cords. The intruders then ransacked the house, during which time they continued physically assaulting CD, kicking her about the body and head as they walked by. The attackers left through the garage, taking several belongings from the home and driving off in BD's pickup truck. CD was able to escape her bonds, free her husband, and drive them to the hospital where they both received emergency treatment for their injuries.

---

[1] Because appellant does not challenge the sufficiency of the evidence to support his conviction, we provide only a general overview of the facts of the case. *See King v. State*, 953 S.W.2d 266, 267 (Tex. Crim. App. 1997). We provide additional facts as necessary to advise the parties of the Court's decision and the basic reasons for it. *See* Tex. R. App. P. 47.4. The facts recited are taken from the testimony and other evidence presented at trial.

[2] In order to protect the privacy of the victims, we refer to them only by their initials.

2

Based on information from the victims that one or more of their attackers had possibly worked for them in the past, police began searching for appellant. When they approached the open doorway to appellant's house, the only visible occupant awoke. The officers explained the purpose of their visit and requested entry. The occupant invited them in and stepped aside to accommodate their entry. After entering the residence, the officers found additional occupants sleeping. Among them were appellant and his co-defendants, one of whom had a lump on his head and a wound on his hand, both consistent with the injuries CD described inflicting on one of her attackers. The officers secured the occupants and the residence until they obtained a search warrant. On execution of the search warrant, police recovered several items stolen from the ranch house. Appellant and four other occupants were detained and transported to the sheriff's office for questioning. During his interview, appellant confessed his participation in the home invasion, including the beating of both BD and CD and the sexual assault of CD.

Appellant was charged in an eight-count indictment with multiple offenses stemming from the home invasion.[3] Following a jury trial, appellant was convicted of all eight offenses. The jury assessed his punishment at imprisonment in the Texas Department of Criminal Justice for each

---

[3] In particular, appellant was charged with the following offenses:

Count One: aggravated sexual assault of CD (penetration of her sexual organ).
Count Two: aggravated sexual assault of CD (penetration of her anus).
Count Three: burglary of a habitation.
Count Four: aggravated robbery of BD.
Count Five: aggravated robbery of CD.
Count Six: injury to the elderly of BD.
Count Seven: aggravated assault of BD.
Count Eight: aggravated assault of CD.

offense with the sentences ranging from 20 years to life.[4]  At the State's request, the trial court

ordered the life sentence imposed for Count Two to be served consecutively to the life sentence

imposed for Count One.

## DISCUSSION

In three points of error on appeal, appellant complains about the trial court's denial

of his motion to suppress, the unlawful entry of his home by police, and error in the jury charge.

### Motion to Suppress

Prior to trial, appellant filed a general motion to suppress.  At the pretrial suppression

hearing, appellant clarified for the trial court that he sought to suppress two recorded statements:

a video recording of appellant's interview with a Texas Ranger and a subsequent audio recording

made in the ranger's patrol car when appellant directed law enforcement officials to the location of

stolen property.  At the conclusion of the suppression hearing, the trial court found that appellant's

statements were freely and voluntarily made.[5]

---

[4]  Specifically, the jury assessed appellant's punishment as follows:

Count One, aggravated sexual assault:  Life imprisonment and a $10,000 fine.
Count Two, aggravated sexual assault:  Life imprisonment and a $10,000 fine.
Count Three, burglary of a habitation:  50 years.
Count Four, aggravated robbery:  Life imprisonment.
Count Five, aggravated robbery:  Life imprisonment.
Count Six, injury to the elderly:  Life imprisonment and a $10,000 fine.
Count Seven, aggravated assault:  20 years.
Count Eight, aggravated assault:  20 years.

[5]  At trial, the judge instructed the jury in the court's charge that it should not consider any statements by appellant for any purpose unless it believed beyond a reasonable doubt that appellant voluntarily made the statements.

In his first point of error, appellant challenges the trial court's denial of his motion to suppress. He argues that several circumstances demonstrate that, under the totality of circumstances, his statements were involuntary: the denial of an attorney, his apparent illness during the interview, a brain injury, and cultural and language barriers that diminished his ability to understand and comprehend his situation.[6] He also mentions in his brief that he was not allowed to shower, he "had possibly gone without sleep," he was interrogated over a number of hours, and some of the interrogation was conducted before the video recording began.[7]

We review a trial court's ruling on a motion to suppress evidence for an abuse of discretion, applying a bifurcated standard of review in which we give almost total deference to a trial judge's findings of historical fact and credibility determinations that are supported by the record, but review questions of law de novo. *Arguellez v. State*, 409 S.W.3d 657, 662 (Tex. Crim. App. 2013); *Crain v. State*, 315 S.W.3d 43, 48 (Tex. Crim. App. 2010). When considering whether a statement was voluntarily made, we look to the totality of the circumstances surrounding its acquisition. *Delao v. State*, 235 S.W.3d 235, 239 (Tex. Crim. App. 2007).

The record of the suppression hearing reflects that appellant and four other occupants of the residence, including his two co-defendants, were taken into custody the evening of April 14, 2009, the day following the night of the home invasion. They were transported directly to the sheriff's office for interviews. Jesse Ramos, a ranger with the Texas Department of Public

---

[6] Appellant is from El Salvador.

[7] Initially, we note that appellant did not assert at the suppression hearing that the length of the interview, not being allowed to shower, the unrecorded portion of the interview, his illness during the interview, or a brain injury were circumstances that rendered his statements involuntary.

Safety, conducted the interviews.[8]  The interview of the first suspect began at approximately 8:45 p.m.  The suspects were interviewed in turn until approximately 4:00 a.m.  At that time, after the interview of the fourth suspect, all five suspects were taken to the Burnet County jail.  The following afternoon, appellant was brought back to the sheriff's office for his interview.  After a brief preparation period during which Ranger Ramos established a rapport with appellant and confirmed that he could communicate with him, the video recording of appellant's interview began at approximately 2:25 p.m.  The video recording of appellant's statement demonstrates that appellant's interview lasted approximately 23 minutes.  At the end of the interview, appellant agreed to go with law enforcement officials to show them the location of some stolen property.  The audio recording of appellant and Ranger Ramos as they traveled in the ranger's car lasts approximately one hour.[9]

Although is undisputed that appellant was in custody throughout the night awaiting his interview, the record reflects that his actual interview lasted less than two hours.  Accordingly, we reject appellant's assertion that he was "interrogated over a number of hours" and that such circumstance rendered his statements involuntary.  In this case, the mere length of the questioning, which was not excessive, does not require the conclusion that appellant's statements were involuntary.

---

[8]  Ranger Ramos was certified by the Texas Department of Public Safety as proficient and fluent in Spanish.  He routinely spoke Spanish and translated that language throughout his 28 years as a ranger.

[9]  The length of the audio recording appears to be dictated by the time necessary to travel to the location to which appellant directed the law enforcement officials.  While appellant and Ranger Ramos spoke throughout the drive, the conversation had multiple pauses and was not a continuous non-stop interview.

6

The trial court made the finding that "the environment and comfort accommodations were appropriate." The record supports this finding and refutes appellant's claims to the contrary. The record does not demonstrate that appellant was prohibited from showering or deprived of sleep. Testimony at the suppression hearing indicated that when the suspects were transported to the jail, initial instructions to the jail staff were to keep them separated and not to allow them showers until search warrants to collect further evidence from their persons had been obtained. However, the record does not reflect how long that ban on showers was in effect. On the video recording of his interview, appellant appears in jail clothing, suggesting that he was allowed to change clothes and possibly shower. Moreover, even if appellant had still not been permitted to shower by the time of his interview, we do not find that being prohibited from showering for one day in order to preserve evidence rendered appellant's statements involuntary.

In addition, no evidence supports appellant's claim that the lack of sleep rendered his statement involuntary. No evidence in the record reflects that appellant was deprived of the opportunity to sleep or that he in fact did not sleep. Unquestionably, appellant was held in seclusion from the time he was taken into custody until his interview. However, the record shows that while at the sheriff's office, appellant was kept in a holding cell that had a bench to lie down on, a toilet, and a water fountain.[10] Thus, appellant had access to a place to sleep, bathroom facilities, and water. The record does not reflect what his accommodations were after he was transferred to the jail. The

---

[10] The record reflects that the Burnet County jail used to be located at the sheriff's office. When the old jail was shut down, the sheriff's office retained access to the old booking area that contains several holding cells. It was in these cells that appellant and the other suspects were held while waiting to be interviewed by Ranger Ramos.

record does reflect, however, that for the major portion of the night, while in the holding cell at the sheriff's office, appellant had the opportunity to sleep. Moreover, nothing in the record suggests that appellant showed signs of fatigue or sleep deprivation during his interview. Accordingly, we conclude that the purported lack of sleep did not render appellant's statements involuntary.

Appellant also claims that he was ill during the interview and that he suffered from a brain injury. However, no evidence of such was presented at the suppression hearing. Appellant offered no medical records or testimony documenting any illness, injury, or diagnosis of brain trauma at the suppression hearing. The only evidence suggesting a purported brain injury was appellant's comment during the ride in Ranger Ramos's car that he had accidentally "hit [himself] on the head" six months earlier. Likewise, the only evidence of illness was at the very end of the audio recording when appellant asked the ranger for a pill because his "whole head [was] hurting." The judge watched the video recording of appellant's interview and listened to the audio recording of the conversation in the ranger's car and could have made his own determination as to whether appellant was ill or otherwise impaired during the interview. Based on his findings, the judge did not construe appellant's prior accident or headache sufficient evidence to demonstrate that his statements were involuntary. Accordingly, we conclude that appellant's alleged illness and brain injury are not supported by the record and, in any event, did not render his statements involuntary.

Appellant argues that because he was from El Salvador, cultural and language barriers diminished his ability to understand his rights and the situation he was in. He claims that he did not understand why he was being questioned and that he ignorantly talked to law enforcement because, as an El Salvadoran national, he did not understand the dialect of the ranger. The record does not

8

support this claim. Before interviewing appellant, Ranger Ramos informed appellant of his rights in Spanish and confirmed that appellant indicated that he understood those rights. The ranger testified that he read the *Miranda* warnings to appellant in Spanish and allowed him to see the warning form, written in Spanish, so he could read it himself. Appellant signed that form, indicating his understanding of his constitutional rights. Also, once the video recording began, Ranger Ramos again informed appellant of his constitutional rights. Afterwards, appellant readily answered questions and conversed with the ranger. Appellant presented no evidence at the suppression hearing that he was unable to intelligently understand the ranger's questions or instructions. While it is true that appellant spoke Spanish with a different dialect, Ranger Ramos testified that only a few words were different and that he was able to clarify appellant's meaning as to the words he used. The ranger's testimony demonstrates that he was able to effectively communicate with appellant. And again, the trial court watched and listened to the recorded statements. On the video recording, appellant can be seen easily conversing with Ranger Ramos. A review of the transcription of the interview reveals that appellant never expressed confusion or indicated that he did not understand either the questions or the situation. The same is true of the audio recording. Accordingly, we find that appellant's claim of cultural and language barriers is not demonstrated by the record and, consequently, does not support a finding that his statement was involuntary.

Finally, appellant raises two procedural issues that he contends demonstrate that his statements were involuntary: an unrecorded portion of the interview and his alleged request for an attorney. The record reflects that prior to conducting the recorded interview, Ranger Ramos met with appellant to prepare for the interview. During this period, which lasted approximately

15 to 30 minutes, Ranger Ramos established a rapport with appellant and confirmed that he could communicate with him notwithstanding the different Spanish dialects. At the suppression hearing, the ranger testified that he "established rapport with [appellant], made him feel comfortable, told him who I was, asked about him, his family life, read him his rights, and then instructed him why I was there." He denied physically grabbing appellant, stating that he did not touch appellant at all, and testified that he did not make any threats or promises. The record does not contain any evidence that anything untoward or coercive occurred during this unrecorded preparation time. We conclude that this unrecorded preparation time was not a circumstance that rendered appellant's statement involuntary.

Appellant also argues that his request for a lawyer was ignored and that his invocation of counsel rendered his statement involuntary. The statement that appellant asserts was an invocation of his right to counsel occurred during the video recorded interview after appellant had already provided details of the offenses, including the beating of both BD and CD and his sexual assault of CD:

| Appellant: | Look, allow me . . . if I can ask you a question. Can you see if there could be an arrangement from, from this problem man? |
| Ramos: | How? |
| Appellant: | To get an attorney and truthfully some well, some will help . . . to [get] out of this quickly. |
| Ramos: | Well quickly, I don't know because we're still (inaudible) the case — real real serious and that's why I want to know everything . . . . |

At the conclusion of the suppression hearing, after watching the video recording of appellant's interview and reading the transcription of it, the trial court held that appellant did not invoke his right to counsel. We agree.

An accused has the right to have an attorney present during custodial interrogation. *Edwards v. Arizona*, 451 U.S. 477, 482 (1981); *see* U.S. Const. amends. V, XIV. Once an accused has invoked that right, police interrogation must stop until counsel has been made available or the accused himself initiates a dialogue with the police. *Edwards*, 451 U.S. at 484–85; *State v. Gobert*, 275 S.W.3d 888, 892 (Tex. Crim. App. 2009). However, not every mention of a lawyer will suffice to invoke the right to the presence of counsel during questioning. *Gobert*, 275 S.W.3d at 888; *Dinkins v. State*, 894 S.W.2d 330, 351 (Tex. Crim. App. 1995). An ambiguous or equivocal statement regarding counsel does not require officers to halt the interrogation or even to seek clarification. *Davis v. United States*, 512 U.S. 452, 461–62 (1994); *Gobert*, 275 S.W.3d at 892. A suspect must articulate his desire for counsel to be present for purposes of custodial interrogation, and he must do so with sufficient clarity that a reasonable officer under the circumstances would understand it to be just that. *Davis*, 512 U.S. at 459; *Gobert*, 275 S.W.3d at 892–93; *see Lucas v. State*, 791 S.W.2d 35, 45 (Tex. Crim. App. 1989) ("The right to counsel is considered invoked where a person indicates he or she desires to speak to an attorney or have an attorney present during questioning."). Whether the particular mention of an attorney constitutes a clear invocation of the right to counsel during questioning depends on the statement itself and the totality of the surrounding circumstances. *Davis*, 512 U.S. at 459; *Gobert*, 275 S.W.3d at 892.

Here, appellant's reference to a lawyer to "get out of this quickly" was not an unambiguous invocation of his right to have counsel present during questioning because a reasonable officer would not necessarily have understood such statements as a request for an attorney.[11] His mention of a lawyer combined with his asking about "an arrangement from this problem" suggests that appellant wanted help to resolve the situation. At best, his comments were a request for legal representation to dispose of the case or engage in plea negotiations. They were not, however, an unequivocal request to have an attorney present with him during his custodial interrogation prior to further questioning by Ranger Ramos. Under these circumstances, we conclude that the trial court did not abuse its discretion in finding that appellant did not unambiguously invoke his right to counsel for purposes of custodial interrogation.

Ultimately, the trial court found that appellant's statements on the video recording of the interview were "knowingly and intelligently freely and voluntarily made after waiving his rights, and the defendant did not invoke counsel or terminate the interview." The court similarly found that appellant's statements on the audio recording were "freely and voluntarily made" without the invocation of counsel or termination of the interview. Viewed in the light most favorable to the trial court's ruling, the record reflects that, under the totality of the circumstances, appellant's statements were voluntarily made. *See Carter v. State*, 309 S.W.3d 31, 41–42 (Tex. Crim. App. 2010) (trial court is "sole and exclusive trier of fact and judge of the credibility of the witnesses," particularly when motion to suppress is based on voluntariness of confession) (citing *Delao*,

---

[11] Although the standard is objective, we note that Ranger Ramos testified at the suppression hearing that he did not consider appellant's comments to be an unequivocal request to have an attorney present prior to further questioning.

12

235 S.W.3d at 238); *Green v. State*, 934 S.W.2d 92, 98–99 (Tex. Crim. App. 1996) (in context of determining voluntariness of confession, trial court is sole factfinder and may elect to "believe or disbelieve any or all" of evidence presented at hearing on motion to suppress). Therefore, we conclude that the trial court did not abuse its discretion in denying appellant's motion to suppress. We overrule appellant's first point of error.

### Entry of Appellant's Residence

In his second point of error, appellant argues that all evidence obtained after entry into his home should be suppressed and his convictions should be reversed because the entry by law enforcement officers into his home was unlawful. The State responds that appellant failed to raise this issue with the trial court and therefore waived the complaint. We agree with the State.

To preserve a complaint for appellate review, the record must show that the complaint was made to the trial court by a timely request, objection, or motion that stated the grounds for the ruling that the complaining party sought from the trial court with sufficient specificity to make the court aware of the complaint. Tex. R. App. P. 33.1(a)(1)(A); *Clark v. State*, 365 S.W.3d 333, 339 (Tex. Crim. App. 2012). Even constitutional rights may be waived if the proper request, objection, or motion is not asserted in the trial court. *Saldano v. State*, 70 S.W.3d 873, 886–87 (Tex. Crim. App. 2002); *see Mendez v. State*, 138 S.W.3d 334, 342 (Tex. Crim. App. 2004).

Appellant raises his complaint about the purported unlawful entry into his home for the first time on appeal. He never raised this issue with the trial court, either by a pretrial motion to

13

suppress or by an objection to the admission of evidence during trial. Accordingly, this complaint has not been preserved for our review.[12] We overrule appellant's second point of error.

## Error in the Jury Charge

Consistent with Count One of the indictment, the jury charge permitted the jury to find appellant guilty of aggravated sexual assault if it found beyond a reasonable doubt that he

> did then and there, intentionally or knowingly cause the penetration of the sexual organ of [CD] by the Defendant's sexual organ, without the consent of [CD], and that the Defendant did then and there, by acts or words, threaten to cause, or place [CD] in fear that, death or serious bodily injury would be imminently inflicted on [BD] or [CD], and said acts or words occurred in the presence of [CD.]

---

[12] Appellant bases his complaint on the recent decision of the United States Supreme Court in *Florida v. Jardines*, handed down after his trial. In *Jardines*, the Supreme Court held that using a drug-sniffing dog on a homeowner's porch to investigate the contents of the home is a "search" within the meaning of the Fourth Amendment. 133 S. Ct. 1409, 1417–18 (2013). Relying on *Jardines*, appellant argues that the police entry onto his porch (prior to the entry into his home with permission) was unlawful because the officers approached his home with specific information about the suspects and the intent to investigate. However, the *Jardines* case does not excuse appellant from the error-preservation requirement. In any event, *Jardines* does not create a new constitutional protection or fundamental right. The Fourth Amendment protection (to be free from unreasonable searches and seizures) has long been afforded to the home and curtilage. *Id.* at 1414; *see Oliver v. United States*, 466 U.S. 170, 180 (1984). The *Jardines* opinion was limited to the question of whether the officers' behavior in using a drug-dog on the defendant's porch was a search within the meaning of the Fourth Amendment. *Jardines*, 133 S. Ct. at 1414. Here, no drug-dog was involved in the police entry onto appellant's porch. Appellant reads *Jardines* too broadly in suggesting that merely approaching a residence during the course of an investigation with information about a crime or a suspect constitutes an unlawful search. As the Supreme Court reaffirmed, "a police officer not armed with a warrant may approach a home and knock, precisely because that is 'no more than any private citizen might do.'" *Id.* at 1416 (quoting *Kentucky v. King*, 131 S.Ct. 1849, 1862 (2011)). That is what happened here. The officers approached appellant's home to conduct a "knock and talk" during which they were invited into the home. *See Valtierra v. State*, 310 S.W.3d 442, 448 (Tex. Crim. App. 2010) (owner's or occupant's voluntary consent makes entry into residence by police officers constitutionally "reasonable").

14

The Count One application paragraphs also permitted the jury to find appellant guilty of aggravated sexual assault as a party to the offense committed by either of his co-defendants. The jury instructions for Count Two were substantially similar to the above language, with the exception that they refer to the penetration of CD's anus instead of sexual organ. As with Count One, the Count Two application paragraphs also permitted the jury to find appellant guilty of aggravated sexual assault as a party to the offense committed by either of his co-defendants.

At trial, appellant objected to the inclusion of the phrase "place [CD] in fear that death or serious bodily injury would imminently be inflicted upon [BD]" in the application paragraphs of Counts One and Two because, according to appellant, CD testified that at the time of the sexual assaults, she believed her husband was already dead. The trial court overruled his objection and included the objected-to language in the jury charge. In his third point of error, appellant asserts that the trial court erred in doing so.

The trial court is required to provide the jury with a written charge setting forth the law applicable to the case. Tex. Code Crim. Proc. art. 36.14. The court's instructions must "apply the law to the facts adduced at trial." *Sanchez v. State*, 376 S.W.3d 767, 773 (Tex. Crim. App. 2012). Thus, the court's instructions should be reduced to the theories that are supported by the evidence at trial. *Moulton v. State*, 395 S.W.3d 804, 810 (Tex. Crim. App. 2013) (citing *Sanchez*, 376 S.W.3d at 774); *see Gray v. State*, 152 S.W.3d 125, 128 (Tex. Crim. App. 2004) ("Jury charges which fail to apply the law to the facts adduced at trial are erroneous.").

15

At trial, CD testified that two of the three intruders sexually assaulted her. The relevant portions of her testimony about the sexual assault perpetrated by the first assailant were as follows:

Q      During this sexual assault, were you in fear for you and you [sic] husband's life?

A      I thought [BD] was dead, and yes, I thought I was going to die.

Q      And if your husband wasn't dead, did you think he would be killed?

A      That thought never crossed my mind because I thought he was already dead. I was worried about -- my main worry at that moment was that our children would see the crime scene photos and see us like that, and that really upset me.

Q      Did you feel that the words and actions of these persons constituted a threat to the life of you and your husband?

A      Yes.

Q      An imminent threat?

A      Yes, sir.

Q      And did these words and actions occur in your presence?

A      Yes, they did.

In addition, CD testified about the sexual assault perpetrated by the second assailant as follows:

Q      Now, at this point, what are you thinking?

A      I am going through my confessions, saying the Lord's Prayer, worried that we're going to die and that, again, our children will see our bodies in crime scene photos.

16

Focusing on the portions of her testimony about her belief that her husband was dead, appellant maintains that the trial court erred by submitting the alternative theory that CD feared the imminent infliction of death or serious bodily injury on her husband. He argues that her testimony demonstrated that she already believed he was dead at the time the sexual assaults occurred, so the evidence failed to show that she feared that death or serious bodily injury would be inflicted on him.

However, appellant ignores CD's confirmation that she felt that the words and actions of the assailants constituted a threat to the life of her and her husband as well as her testimony that during the second sexual assault she was "worried that we're going to die" referring to herself and her husband. Accordingly, there was some evidence to support the inclusion of the phrase "place [CD] in fear that death or serious bodily injury would imminently be inflicted upon [BD]" in the jury charge as an alternative manner and means of committing the aggravated-sexual-assault offenses, and the trial court did not err by including it.

Moreover, even if the trial court erred in submitting this alternate theory to the jury in the application paragraphs for Counts One and Two, we conclude that appellant was not harmed. *See Barrios v. State*, 283 S.W.3d 348, 350 (Tex. Crim. App. 2009) (properly objected to jury-charge error requires reversal when defendant suffered "some harm"). In this case there is clearly evidence in the record that CD feared that death or serious bodily injury would be imminently inflicted on her. When a jury returns a general guilty verdict on an indictment charging alternate methods of committing the same offense, the verdict stands if the evidence is sufficient to support a finding under any of the theories submitted. *Sanchez*, 376 S.W.3d at 775. The presence of overwhelming evidence of guilt plays a determinative role in resolving the issue and may be considered when

17

assessing jury-charge error. *Id.* Here, CD explicitly testified that throughout the sexual assaults she feared for her life.

Having considered the entire record, we find that any error in submitting, in the jury charge, the alternative theory of fearing imminent death or serious bodily to her husband did not result in harm. The jury charge permitted the jury to convict appellant either acting alone or as a party to the aggravated-sexual-assault offenses under at least one theory that was overwhelmingly supported by the evidence. We overrule appellant's third point of error.

**Cumulation Order**

As an additional matter, we address sua sponte the legality of the trial court's cumulation order. At the oral pronouncement of sentence, the trial court granted the State's motion to cumulate and ordered the life sentence for Count Two to commence when the life sentence for Count One ceased to operate. The written judgment of conviction for Count Two reflects this cumulation order.

When offenses arising out of the "same criminal episode" are tried in the same criminal action, the sentences must be concurrent unless a specific statutory exception within chapter three of the Texas Penal Code provides otherwise. Tex. Penal Code § 3.02(a); *Sullivan v. State*, 387 S.W.3d 649, 651 (Tex. Crim. App. 2013). One such exception provides that consecutive sentences may be imposed for convictions for certain types of sexual offenses if the offenses were committed against a victim younger than 17 years of age. Tex. Penal Code § 3.03(b)(2)(A). This appears to be the exception the State relied on in this case. However, it is inapplicable here because CD was not under 17 at the time of the offenses. Thus, the sentence for Count Two does not fall

18

within this exception. Because no exception applies, the life sentence for Count Two must run concurrent with the other sentences obtained at trial. *See Sullivan*, 387 S.W.3d at 651 (sentence for count involving 17-year-old child victim must run concurrent with other sentences obtained at trial because it did not fall within sexual-offense exception because child victim was not under 17 at time of offense); *see also* Tex. Penal Code § 3.03(a).

An improper cumulation order is a void sentence. *LaPorte v. State*, 840 S.W.2d 412, 415 (Tex. Crim. App. 1992). Although appellant has not complained at trial or on appeal about the cumulation of the Count Two sentence being an illegal sentence, any court with jurisdiction has inherent authority to notice and take action on an illegal or void sentence at any time, even sua sponte. *Mizell v. State*, 119 S.W.3d 804, 805–07 (Tex. Crim. App. 2003). An unlawful cumulation order is remedied by reforming the judgment to set aside the order. *Robbins v. State*, 914 S.W.2d 582, 584 (Tex. Crim. App. 1996); *see Beedy v. State*, 250 S.W.3d 107, 113 (Tex. Crim. App. 2008) (reaffirming that unlawful cumulation order is remedied by reforming judgment to set aside cumulation order). Accordingly, we modify the judgment of conviction for Count Two to delete the cumulation order.

**Clerical Errors in Judgments**

Finally, we observe that some of the judgments of conviction contain clerical errors. This Court has authority to modify incorrect judgments when the necessary information is available to do so. *See* Tex. R. App. P. 46.2(b); *Bigley v. State*, 865 S.W.2d 26, 27–28 (Tex. Crim. App. 1993). Because the necessary information is available here, we modify the incorrect judgments.

19

First, the written judgment of conviction for the Count One aggravated sexual assault erroneously states that "THIS SENTENCE SHALL RUN CONSECUTIVELY." In its oral pronouncement of sentence, however, the trial court did not order the Count One life sentence to be served consecutive to any of the other sentences, and, as noted above, the Count One life sentence was not subject to cumulation given CD's age. We therefore modify the judgment of conviction for Count One to delete "CONSECUTIVELY" and instead reflect that the sentence shall run "CONCURRENTLY."

Second, the judgments of conviction for aggravated assault in Counts Seven and Eight reflect that the "Statute for Offense" is "22.04 Penal Code." However, section 22.04 of the Penal Code is the statute for injury to a child, elderly individual, or disabled individual. The statute for aggravated assault as alleged in Counts Seven and Eight is section 22.02(a)(2) of the Penal Code. Accordingly, we modify the judgments of conviction for aggravated assault in Counts Seven and Eight to state that the "Statute for Offense" is "22.02 Penal Code."

## CONCLUSION

Having overruled appellant's three points of error, we affirm the trial court's judgments of conviction for Counts Three (burglary of a habitation), Four (aggravated robbery), Five (aggravated robbery), and Six (injury to the elderly). Correcting non-reversible error, we modify the remaining judgments of conviction as follows: we modify the judgment for Count One (aggravated sexual assault) to delete "CONSECUTIVELY" and instead reflect that the sentence shall run "CONCURRENTLY," we modify the judgment for Count Two (aggravated sexual assault) to delete the cumulation order, and we modify the judgments for Counts Seven (aggravated assault) and Eight

20

(aggravated assault) to reflect that the "Statute for Offense" is "22.02 Penal Code."  As so modified, we affirm the trial court's judgments of conviction for Counts One, Two, Seven, and Eight.

_____

J. Woodfin Jones, Chief Justice

Before Chief Justice Jones, Justices Pemberton and Field

Affirmed in Part; Modified and, as Modified, Affirmed in Part

Filed:   April 17, 2014

Do Not Publish